IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RENEE H.,

          Plaintiff,

    v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

CIVIL ACTION FILE NO.

1:18-CV-1298-JFK

## FINAL OPINION AND ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision

of the Commissioner of the Social Security Administration ("SSA") which denied her

applications for disability insurance benefits.  For the reasons set forth below, the

Court **AFFIRMS** the decision of the Commissioner.

### I.     Factual Background & Procedural History

On May 22, 2014, the claimant filed an application for disability insurance

benefits ("DIB"), alleging that she became disabled on July 29, 2009.[1] [Record ("R.")

167–68 / Exhibit 1D].   After Plaintiff's application was denied initially and on

---

[1] Plaintiff filed a prior application for DIB, which was denied on October 18, 2011. [R. 10].  As a result, the relevant time period for the instant application for DIB is from October 19, 2011, through December 31, 2014.  [R. 10].

reconsideration, an administrative hearing was held via video conference on February 27, 2017. [R. 31–57, 82–100]. The Administrative Law Judge ("ALJ") issued a decision denying Plaintiff's application on June 8, 2017. [R. 7–29]. The Appeals Council denied Plaintiff's request for review on February 21, 2018. [R. 1–6]. Having exhausted her administrative remedies, Plaintiff filed a complaint in this Court on March 30, 2018, seeking judicial review of the final decision of the Commissioner. [Doc. 5]. The parties have consented to proceed before the undersigned Magistrate Judge.

The decision of the ALJ [R. 12–25] states the relevant facts of this case as modified herein as follows:

Plaintiff, born on February 7, 1967, has a high school education and last worked as an administrative clerk in 2009. At the hearing, the claimant testified that she was 50 years old and that she was 5 feet, 9 inches tall and weighed 230 pounds.[2] She is married with a 13-year old child. The claimant had back surgery in 2001 and returned to work for a number of years. The claimant stopped working in 2009 to stay at home with her daughter. While the claimant reported that she was experiencing back issues

---

[2] As of January 2015, Plaintiff weighed approximately 251 pounds. [Exhibit 3F at 18]. Plaintiff's Body Mass Index ("BMI") is above 30. According to the National Institutes of Health ("NIH"), a BMI over 30 constitutes obesity.

2

at that time, her husband's earnings allowed the claimant to stay at home. [R. 21 (claimant's husband was making "good money")].

Medical Evidence Prior To Date Last Insured

As previously noted, the relevant time period for the instant application for DIB is from October 19, 2011, through December 31, 2014. [R. 10]. A review of the medical evidence of record reveals that the claimant has a history of degenerative disc disease of the lumbar spine dating back to at least 2008. However, there are no records of Plaintiff receiving medical treatment between October 19, 2011, and April 1, 2012.[3]

On April 2, 2012, Laurie M. Staub, CFNP ("Staub"), noted within treatment records that the claimant had a history of back surgery in 2001 and that she was taking chronic pain medication. Her depression and anxiety were controlled with Xanax. [Exhibit 5F at 33]. On physical examination, the claimant had diminished lung sounds but did not use accessory muscles for respiratory effort. Her judgment and insight were intact; she was oriented times three; her memory was intact; and she had no depression or anxiety. [Exhibit 5F at 34]. The claimant's prescribed medications were

---

[3] Plaintiff concedes that "the record did[ not] document the severity of her impairments until 2012" and represents that "Plaintiff would not take issue with a finding that her disability did not commence when she last worked" in July 2009. [Doc. 14 at 2].

AO 72A
(Rev.8/82)

Amitriptyline, Effexor, Xanax, Lyrica, and Ultram. Staub ordered lumbar x-rays and referred the claimant to pain management. [Exhibit 5F at 35].

On July 9, 2012, the treatment note of Jack Cheng, M.D. ("Dr. Cheng"), indicated that the claimant presented to establish care and request medication refills. [Exhibit 6F at 26]. On physical examination, Dr. Cheng reported normal respiratory and cervical examinations. The claimant had tenderness elicited in the lumbar region with a shocking sensation down to the knee produced on deep palpations of her right buttock. The claimant had normal muscle tone, normal strength and normal sensation; her memory was not impaired; and she had a mildly antalgic gait and an euthymic mood with normal affect. [Exhibit 6F at 27–28]. By August 6, 2012, the claimant reported that Clonazepam was working very well. [Exhibit 6F at 24]. Dr. Cheng reported that he would not continue narcotics if the claimant did not get her magnetic resonance imaging ("MRI"). [Exhibit 6F at 25].

On August 29, 2012, a chest x-ray showed improvement of pneumonia. [Exhibit 6F at 66]. A computed axial tomography ("CT") scan of the chest of October 10, 2012, demonstrated left pleural effusion which infiltrated both lungs, most of which have a ground-glass appearance and were seen in the right upper, middle, and lower

AO 72A
(Rev.8/82)

lung and left upper lung.[4]  There appeared to be some atelectasis (collapsed lung) in the lingual and, to a lesser extent, in the left lung base, potentially representing inflammatory processes.  There were mediastanial and hilar nodes, the most prominent of which were in the right para-tracheal precarinal region.  They might represent reactive nodes. [Exhibit 6F at 32–33, 64–65].  An MRI on October 10, 2012, revealed multilevel central canal, lateral recess, and neural foraminal narrowing most pronounced at L2-3 and to a lesser extent at L1-2 and L3-4 related to small disc and osteophyte complex, ligamentum flavum, and facet hypertrophy.  The MRI also revealed right lateral recess and neural foraminal stenosis at L4-5 related to rightward paracentral disc and osteophyte complex and facet hypertrophy and bilateral neural foraminal narrowing at L5-S1 related to disc and osteophyte complex and facet hypertrophy.  [Exhibit 6F at 30–31, 63–64].

On September 4, 2012, Dr. Cheng's treatment notes report that the claimant presented for an emergency department ("ER") follow-up where she was found to have bilateral pneumonia.  The claimant was using an inhaler as needed and reportedly

_____

[4] "Pleural effusion is a buildup of fluid between the layers of tissue that line the lungs and chest cavity. . . .  The body produces pleural fluid in small amounts to lubricate the surfaces of the pleura. . . .  This is the thin tissue that lines the chest cavity and surrounds the lungs. . . .  Pleural effusion is an abnormal, excessive collection of this fluid."  National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, Pleural effusion, https://medlineplus.gov/ency/article/000086.htm (last viewed August 22, 2019).

AO 72A
(Rev.8/82)

began smoking again the moment she got in the car on discharge. [Exhibit 6F at 22].

Dr. Cheng noted that the claimant's pneumonia was resolving. [Exhibit 6F at 23].

A Pulmonary Function Test on October 16, 2012, revealed an FEV1 of 1.68 [Exhibit 6F at 42]. On October 31, 2012, Awungjia Leke-Tambo, M.D. ("Dr. Leke-Tambo"), reported that the claimant was using supplemental oxygen and was hypoxic on room air. She had expiratory wheezing on examination. [Exhibit 6F at 55]. She was smoking one pack per day and walked three to four times per week. [Exhibit 6F at 56]. Dr. Leke-Tambo reported a normal physical examination, including a normal gait and station. [Exhibit 6F at 57]. Dr. Leke-Tambo assessed pneumonia. [Exhibit 6F at 58]. A laboratory note of Dr. Cheng reported that the claimant had not refilled her Clonazepam in a month. [Exhibit 6F at 29]. In November 2012, Dr. Cheng reiterated the importance of smoking cessation. [Exhibit 6F at 16].

On November 28, 2012, the claimant consulted with neurosurgeon John Gorecki, M.D. ("Dr. Gorecki"). Dr. Gorecki indicated that the claimant reported her back pain severity level to be an eight out of ten, with ten being the most severe pain. [Exhibit 6F at 8]. Dr. Gorecki conducted a thorough examination and reported a completely normal mental status examination. Dr. Gorecki reported a decreased range of motion of the lumbar spine and straight leg raise of the right leg was limited by stiffness. The claimant was observed to have normal muscle strength and tone;

6

Romberg's sign[5] was present; and she had an abnormal tandem gait. No assistive devices for ambulation were reported, and she had no generalized erythema. Dr. Gorecki recommended physical therapy. [Exhibit 6F at 11–13].

On November 28, 2012, Dr. Cheng noted that the claimant was to attend physical therapy. [Exhibit 6F at 6]. Dr. Cheng referred the claimant to pain management. [Exhibit 6F at 7]. On December 26, 2012, the claimant reported using oxygen although mainly at night. [Exhibit 6F at 4]. Dr. Cheng reported that the claimant was obese and appeared well though she smelled of smoke. According to Dr. Cheng, the claimant's mood was euthymic and her affect was normal. [Exhibit 6F at 5].

On April 16, 2013, Dr. Cheng's office notes indicated that NEGA Physician's Group ("NEGA") checked with the claimant's reported pulmonology group and learned that the claimant had only been seen by pulmonology twice with the last visit on October 31, 2012. NEGA staff noted that the claimant "is lying to us and prolonging her use of Percocet narcotic pills." [Exhibit 6F at 60]. In a letter dated

---

[5] The term "Romberg's sign" refers to the inability to maintain balance in a standing position with feet together and eyes closed. See National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, Movement - uncoordinated, https://medlineplus.gov/ency/article/003198.htm (last viewed August 22, 2019). Losing balance signals that your sense of position is lost, and the test is considered positive. Id.

AO 72A
(Rev.8/82)

April 19, 2013, NEGA informed the claimant that they would no longer treat her. [Exhibit 6F at 3]. On May 28, 2013, the claimant called NEGA requesting a prescription for Oxycodone. [Exhibit 6F at 59].

On June 5, 2014, a behavioral health note indicated that the claimant presented with complaints of withdrawal symptoms. [Exhibit 2F]. The claimant reported excessive pain because she ran out of medication. She had some depressive episodes, but she was improving. The claimant was assessed with generalized anxiety disorder, opioid dependence, depressive disorder, NOS (not otherwise specified), and a Global Assessment of Functioning ("GAF") value of 65.[6] [Exhibit 2F at 9–10].

On October 2, 2014, a behavioral note of Ganiat Jaiyesinmi Ajayi, M.D. ("Dr. Ajayi"), indicated that the claimant reported increased anxiety and panic attacks. The claimant reported that she was struggling to get back to baseline and was experiencing difficulty sleeping. She denied suicidal ideation, hallucinations, and paranoia. She

---

[6] GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social and occupational functioning." American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 1994) (DSM-IV). A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, familiar relations, judgment, thinking, or mood. Id. A score between 41 and 50 indicates serious symptoms, such as suicidal ideation, serious impairment in social, occupational or school functioning. Id. A score between 51 and 60 indicates moderate symptoms, such as occasional panic attacks or moderate difficulty in social, occupational or school functioning. Id.

was cooperative with eye contact and exhibited normal speech and logical thought. Dr. Ajayi observed anxious mood. The claimant was alert and oriented times four and exhibited fair concentration and judgment with poor memory. Dr. Ajayi assessed generalized anxiety disorder, major depressive disorder without psychosis, opioid dependence, and a GAF value of 65. [Exhibit 4F at l].

<u>Medical Treatment After Date Last Insured</u>

On January 16, 2015, the claimant presented to the ER with complaints of difficulty breathing. [Exhibit 3F at 21]. She reported dyspnea for several days and use of oxygen as needed. [Exhibit 3F at 8]. A chest x-ray showed no acute disease. [Exhibit 3F at 29]. The claimant received a breathing treatment, and there was no distress noted. [Exhibit 3F at 19]. She had wheezes but no pleuritic chest pain and no respiratory distress. [Exhibit 3F at 11]. ER records note that the claimant continued to smoke.

By January 28, 2015, the claimant reported that she was not experiencing panic attacks. The claimant relayed that she had some stress at home with money issues and car trouble. [Exhibit 4F at 4]. A chest x-ray of February 27, 2015, revealed patchy opacities at the left lung base possibly related to aspiration / pneumonia, trace bilateral pleural effusions, right greater than left, with bibasilar atelectasis, and linear opacity within the right mid-lung possibly related to atelectasis or scarring. [Exhibit 5F at 32].

9

Dr. Ajayi's March 3, 2015, behavioral notes indicate that the claimant's reported drug of choice was any opiate. The claimant represented that she had been sober for a year. She was doing okay with depression. The claimant stated that her only stressor was money and that her husband was out on Worker's Compensation for a year due to a neck injury. Dr. Ajayi assessed the claimant with a GAF value of 80. [Exhibit 4F at 5].

On August 26, 2015, a treatment note of Bethany R. Norwood, FNP ("Norwood"), indicated that the claimant reported no hospitalizations or health care treatment outside of the clinic since her last visit. According to the medical evidence of record, the claimant's last treatment was on April 2, 2012. It was also noted for the first time that the claimant had a history of chronic obstructive pulmonary disease ("COPD"). The claimant presented for medication refills. Norwood reported a normal physical examination. Norwood assessed tobacco abuse, anxiety state, NOS, depression, and insomnia. Ventolin for wheezing was prescribed. [Exhibit 5F at 27, 29–31]. On September 25, 2015, and December 9, 2015, Norwood again reported completely normal physical and psychiatric examinations. [Exhibit 5F at 10–11, 23–25].

On June 10, 2016, Staub indicated that the claimant presented with complaints of urinary problems. The claimant reported using oxygen at home, although mostly

AO 72A
(Rev.8/82)

at night, and she continued to smoke. [Exhibit 5F at 2]. The claimant ambulated without difficulty and had no problems with meal preparation or eating. [Exhibit 5F at 3]. On physical examination, Staub reported that the claimant had scattered wheezing with diminished lung sounds, that the claimant did not use accessory muscles, and that she had no depression or anxiety. [Exhibit 5F at 4].

On September 29, 2015, approximately nine months after the date last insured, Plaintiff saw Dr. Gorecki again for evaluation. [Exhibit 8F]. Dr. Gorecki recalled his original consultation with Plaintiff in 2012 for possible surgical solutions as well as the October 2012 MRI of her lumbar area and explained that his previous, more conservative intervention was due largely to Plaintiff's "oxygen dependent COPD." [Exhibit 8F at 2, 6]. Dr. Gorecki described Plaintiff's back pain as "incapacitating pain radiating into the right lower extremity" and recognized that Plaintiff's symptoms "have gradually worsened" and "are made worse by prolonged standing or walking." [Exhibit 8F at 2]. Dr. Gorecki observed that Plaintiff uses a cane and that she is "stooped forward and leans to the right." [Exhibit 8F at 2]. Dr. Gorecki opined (in an undated letter) that Plaintiff was "clearly disabled by severe ongoing back and right leg pain with foot drop[.]" [Exhibit 8F at 2]. Nonetheless, Dr. Gorecki did not identify any specific functional limitations. [Exhibit 8F at 2]. Dr. Gorecki's treatment note

11

indicated that the claimant presented using a cane and reported being treated for depression by her psychiatrist and being followed by Athens Pulmonology.[7] There are no further treatment notes with Dr. Gorecki.

On October 9, 2015, the treatment notes of Angela Calvert ("Calvert") indicated that the claimant presented with complaints of leg swelling for a couple of months, improved with elevation. The claimant was ambulating with a cane. [Exhibit 7F at 6]. The claimant had bilateral 1+ pedal edema, and she had no focal deficits and was alert, cooperative with normal mood and affect, and normal attention span and concentration. She had a decreased range of motion with an abnormal gait and observed to be leaning to the right and bent forward during ambulation. She had decreased breath sounds bilaterally smelling of smoke. She was not in acute distress and had poor dentition. [Exhibit 7F at 8]. A Bilateral Lower Extremity Venous Duplex showed right galvanic vestibular stimulation ("GSV") measured at 10 mm at the junction and demonstrated reflux lasting longer than five seconds. The left GSV was normal. [Exhibit 7F at 10]. The recommended treatment was for the claimant to wear compression hose. [Exhibit 7F at 9].

---

[7] The ALJ expressly stated that the record did not corroborate Plaintiff's statements that she was being treated for depression by a psychiatrist or that she was being followed by Athens Pulmonology. [R. 15].

On February 9, 2017, the claimant had an MRI of the lumbar spine, which demonstrated post-surgical changes at L4-5 and L5-S1. At L4-5, there was an asymmetric degenerative endplate change present encroaching on the right lateral recess and proximal right neural foramen. The record states that a portion of this fining might represent granulation tissue and that there appears to be compromise of the right lateral recess and right neural foramen. Other observations include central disc herniation at L1-2 contributing to canal compromise and displacement of multiple nerve roots but no definite mass effect seen, plus additional levels of degenerative disc disease, facet arthropathy, and superimposed on degenerative change was levoconvex scoliosis. [Exhibit 9F at 2–3]. Staub's treatment notes dated January 18, 2017, indicate that the claimant continued to smoke and that she had scattered wheezing throughout and lumbar spine tenderness. [Exhibit 9F at 8–13].

Plaintiff's Hearing Testimony

During the hearing before the ALJ, the claimant acknowledged that her back symptoms have worsened since 2009. The claimant described her consultation with the neurosurgeon in 2012 and the fact that surgery was not recommended because surgery could potentially make the claimant's symptoms worse. The claimant reported being given a couple of injections to alleviate back pain in addition to physical therapy. The claimant also reported using a cane for the last three years for walking and getting

13

up and down. The claimant represented that she was starting to have walking issues while she was working and that she has fallen on occasion. The claimant further stated that she gets stiff when sitting. The claimant, admittedly still a smoker, testified that she has used supplemental oxygen since 2012, primarily at night but sometimes during the day. The claimant represented that weather, dust, fumes, and perfumes affect her breathing. She stated that she experienced depression when her husband lost his job. The claimant alleged that her depression limits her activities and that her back pain factors in her depression.

According to the claimant, she experiences panic attacks approximately three to four times per week, and she gets jittery, nervous, and sweaty around people. The claimant states that her medication for panic attacks takes between one to one and a half hours to work. The claimant reported that she occasionally requires oxygen during panic attacks.

In terms of daily activities, the claimant reported that her husband does a lot of the cooking and that he and their daughter manage household chores. She stated that they live with their son and his wife who also help with chores. Since 2014, the claimant stated that she could no longer perform any chores and that she would get frustrated and trigger panic attacks.

<u>VE Testimony</u>

The VE first characterized Plaintiff's past relevant work as an administrative clerk (DOT # 219.362-010, light and semi-skilled, SVP of 4). [R. 49]. The ALJ then posed several hypotheticals to the VE to determine whether Plaintiff was capable of performing her past relevant work or other work. [R. 49–50]. In response to the first hypothetical question, premised upon the residual functional capacity ("RFC") ultimately adopted by the ALJ,[8] the VE testified that the hypothetical claimant described by the ALJ would be unable to perform the Plaintiff's past relevant work. [R. 49–50]. Next, to determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured, the ALJ asked the VE whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. [R. 49–51]. The VE testified that, given all of these factors, the individual would have been able to perform the requirements of representative occupations such as 1) Merchandise Marker (DOT # 209.587-034, light

---

[8] As posed, the VE was asked to consider a "hypothetical individual of the Claimant's age, education and past work experience, this hypothetical individual would generally be limited to work at the light exertional level but with additional limitations. They could never climb ladders, ropes[,] or scaffolds. They could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch[,] or crawl. They would have to avoid concentrated exposure to fumes, odors, dust, gases[,] and poor ventilation. They can understand, remember and carry out simple instructions only, have only up to occasional contact with the public and they cannot perform fast pace production work." [R. 49–50].

AO 72A
(Rev.8/82)

and unskilled, SVP of 2, and approximately 400,000 such jobs in the national economy); 2) Garment Sorter (DOT # 222.687-014, light and unskilled, SVP of 2, and approximately 12,000 jobs nationally); and 3) Ticket Taker (DOT # 344.667-010, light and unskilled, SVP of 2, and approximately 25,000 jobs in the national economy).[9] [R. 50]. The ALJ found the VE's testimony consistent with the information contained in the Dictionary of Occupational Titles. [R. 25].

As a result, the ALJ found that the claimant was not under a disability from July 26, 2009, the alleged onset date, through December 31, 2014, the date last insured.

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## II.     Standard of Review

An individual is considered to be disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically

---

[9] The claimant's attorney representative asked no hypothetical questions of the VE at the hearing. [R.25].

16

acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. at 1440. "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)). "The burden is primarily on the claimant to prove that [she] is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving her disability.

See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. At step one, the claimant must prove that she is not engaged in substantial gainful activity. See id. The claimant must establish at step two that she is suffering from a severe impairment or combination of impairments. See id. At step three, the Commissioner will determine if the claimant has shown that her impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. If the claimant is able to make this showing, she will be considered disabled without consideration of age, education, and work experience. See id. "If the claimant cannot prove the existence of a listed impairment, [she] must prove at step four that [her] impairment prevents [her] from performing [her] past relevant work." Doughty, 245 F.3d at 1278. "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides [her] past relevant work." Id. If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. See 20 C.F.R. §§ 404.1520(a), 416.920(a).

AO 72A
(Rev.8/82)

**III.    Findings of Fact**

The ALJ made the following findings:

1.    The claimant last met the insured status requirements of the SSA on December 31, 2014.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 26, 2009, through her date last insured of December 31, 2014.  [20 C.F.R. § 404.1571, *et seq*.].

3.    Through the date last insured, the claimant had the following severe impairments:  degenerative disc disease, COPD, hypertension, obesity, depressive disorder, NOS, generalized anxiety disorder, and opioid dependence.  [20 C.F.R. § 404.1520(c)].

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526].

5.    Through the date last insured, the claimant had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except the claimant can never climb ladders, ropes, or scaffolds.  She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  The claimant must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  She can understand, remember, and carry out simple instructions only and have occasional contact with the public and no fast-paced production work.

6.    Through the date last insured, the claimant was unable to perform any past relevant work.  [20 C.F.R. § 404.1565].

7.    The claimant was born on February 7, 1967, and was 47 years old, which is defined as a younger individual age 18–49, on the date last insured.  [20 C.F.R. § 404.1563].

AO 72A
(Rev.8/82)

8.     The claimant has at least a high school education and is able to communicate in English. [20 C.F.R. § 404.1564].

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  [See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2].

10.     Through the date last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.  [20 C.F.R. §§ 404.1569 and 404.1569(a)].

11.     The claimant was not under a disability, as defined in the SSA, at any time from July 26, 2009, the alleged onset date, through December 31, 2014, the date last insured. [20 C.F.R. § 404.1520(g)].

[R. 12–13, 16, 18, 24–25].

## IV.     Discussion

Plaintiff's primary challenge to the denial of benefits is that the medical evidence relied upon and credited by the ALJ simply cannot be reconciled with a light work RFC because light work by definition requires "a good deal of walking or

20

standing."[10]  Plaintiff does not raise any legal challenge to the ALJ's evaluation of her

mental impairments.

> ### A.    The ALJ's RFC Determination Reflects Application Of The Proper Legal Standards And Is Supported By Substantial Evidence

"The [RFC] is an assessment, based upon all of the relevant evidence, of a

claimant's remaining ability to do work despite [her] impairments. . . .  Along with

[her] age, education and work experience, the claimant's [RFC] is considered in

determining whether the claimant can work."  Lewis, 125 F.3d at 1440 (citing 20

C.F.R. §§ 404.1545(a), 404.1520(f)).  "RFC includes physical abilities, such as sitting,

standing or walking, and mental abilities, such as the ability to understand, remember

and carry out instructions or to respond appropriately to supervision, coworkers and

work pressure."  Dempsey v. Comm'r of Social Security, 454 Fed. Appx. 729, 731 n.3

(11th Cir. 2011) (citation omitted).  In determining the claimant's RFC, the ALJ is

required to consider the limiting effects of all the claimant's impairments, even those

_____

[10] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . . ." 20 C.F.R. § 404.1567(b) (2017).

21

that are not severe.  See Phillips, 357 F.3d at 1238 ("[T]he ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case."); and see Jones v. Dept. of Health & Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (citation omitted) ("Where a claimant has alleged several impairments, the Secretary has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled."); 20 C.F.R. § 404.1545(e).

Here, the ALJ's RFC for Plaintiff reads:

[T]hrough the date last insured, the claimant had the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant can never climb ladders, ropes[,] or scaffolds.  She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch[,] and crawl.  The claimant must avoid concentrated exposure to fumes, odors, dusts, gases[,] and poor ventilation.  She can understand, remember[,] and carry out simple instructions only; have occasional contact with the public and no fast-paced production work.

[R. 18].  The ALJ's RFC contemplates the ability to stand and / or walk for approximately 6 hours.  See SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983) ("the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday").

On appeal, Plaintiff identifies two medically determinable impairments, both deemed to be severe by the ALJ, and attendant symptoms that she contends are

22

inconsistent with the RFC: 1) degenerative disc disease / lumbar radiculopathy, which she asserts causes her to rely on a cane for walking; and 2) COPD, which she asserts requires her to use supplemental oxygen four to five times per week for several hours. The Court briefly discusses both of these impairments.

### 1.    Degenerative Disc Disease / Lumbar Radiculopathy & Cane Use

Plaintiff underwent back surgery in 2001. By 2012, Plaintiff asserts that she was experiencing chronic back pain and was taking pain medications without relief. [Exhibit 5F]. In April 2012, Plaintiff established care with The Longstreet Clinic for her back pain. [Exhibit 5F]. In October 2012, Plaintiff had an MRI of her lumbar spine to explore possible causes for her low back pain. [R. 404–05]. Plaintiff was referred to a neurosurgeon to discuss treatment options. [R. 404–05 ("Your MRI does show findings that may cause your back pain.")]. On November 28, 2012, Plaintiff was seen by neurosurgeon Dr. Gorecki, who confirmed that her MRI supported her claim of back pain. [R. 351]. Dr. Gorecki found that Plaintiff's MRI revealed loss of disk height at L4-5 and 5-1 and possibly a herniated disc at L5-S1. [R. 354]. Upon physical examination, Dr. Gorecki noted limitation of full range of motion of the lumbosacral spine, positive straight leg raising on the right, a motor exam showed dysfunction on the right, tandem gait was abnormal, and he observed a positive

23

Romberg's sign and abnormal ankle reflex. [R. 353]. Dr. Gorecki diagnosed lumbar radiculopathy and considered, but did not ultimately recommend, lumbar fusion from L4-S1. [R. 353–54]. Plaintiff reported constant pain and rated the level of pain as an eight out of ten, with ten being the most severe pain. [R. 349].

Plaintiff testified that she has required use of a cane to ambulate since 2012. [R. 41]. According to Plaintiff, she uses the cane "[a]ny time [she] walk[s]" or has to "get[ ] up and down." [R. 41]. She reported a couple of falls and stated that she used the cane "all the time now." [R. 41]. Plaintiff testified that she would not be able to do the walking and standing on her previous job (superior court clerk in real estate section, lien division). [R. 38–39, 41 ("No, I don't think so, not at all.")]. Plaintiff also testified that she experiences back pain with sitting. [R. 42]. Counsel argued at the administrative hearing that Plaintiff's back pain precluded her from performing even a sedentary job on a full-time basis prior to her date last insured, December 31, 2014. [R. 36–37].

"'To find that a hand-held assistive device, such as a cane, is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance

24

and terrain; and any other relevant information)[.]'" <u>Norman v. Comm'r of Social Security</u>, 2015 WL 4397150, at *5 (M.D. Fla. July 16, 2015) (quoting <u>Wright v. Colvin</u>, 2014 WL 5591058, at *4 (S.D. Ga. November 3, 2014)). "'Moreover, a prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity.'" <u>Id.</u> (quoting <u>Wright</u>, 2014 WL 5591058, at *4).

Here, it is not clear from the record whether Plaintiff's cane was prescribed by a physician.[11] And it is Plaintiff's burden to demonstrate medical necessity. <u>See</u> 42 U.S.C. §§ 423(d)(5)(A) (2018); 20 C.F.R. §§ 404.1512(a) and (c); 404.1529(a); <u>Doughty</u>, 245 F.3d at 1278 (citation omitted). Further, essentially all of the evidence concerning Plaintiff's reliance on a cane is self-reported. As observed by the ALJ, Dr. Gorecki's records do not document Plaintiff's need or use of an assistance device for ambulation or any abnormal gait or stance. [R. 22 (citing Exhibit 6F at 12)]. Similarly, in June 2016, Staub's notes report that Plaintiff ambulated without difficulty. [Exhibit 5F at 3]. Because there is no record evidence establishing medical necessity,

---

[11] In the context of discussing Plaintiff's spouse's Third Party Function Report, the decision seems to attribute the following statement to Plaintiff's spouse and reads, "The claimant uses a cane that was prescribed in 2000 and 2012." [R. 21]. The Commissioner represents that "the record does not indicate that any medical provider prescribed or even suggested that Plaintiff use a cane." [Doc. 13 at 6]. Plaintiff and her husband both assert that the cane was prescribed, but Plaintiff does not cite to a prescription in the administrative record. [R. 191, 203].

AO 72A
(Rev.8/82)

the Court finds that the ALJ did not err in omitting the need for a cane in the RFC determination.

### 2. COPD & Need For Supplemental Oxygen

Plaintiff is diagnosed with COPD and testified that her breathing problems bother her "[m]ost of the time" and that her breathing is affected by the weather, dust, and other irritants. [R. 42–43]. Plaintiff has been using supplemental oxygen at home since being hospitalized for a bout with "double pneumonia" in 2012. [R. 48]. Plaintiff takes oxygen at night and "whenever needed during the day." [R. 42]. According to Plaintiff, she requires oxygen during the day if she has a panic attack, which she estimated as occurring as often as four to five times a week. [R. 47]. She reported getting "really winded" with exertion. [R. 47]. Plaintiff is still a smoker despite efforts to quit. [R. 42].

As noted *supra*, Plaintiff was prescribed supplemental oxygen while being treated for lingering pneumonia. The ALJ acknowledged Plaintiff's testimony concerning her oxygen use and stated, "She uses oxygen at night and sometimes during the day. . . . Sometimes when she has a panic attack, she uses oxygen. She uses it 4-5 times per week for a couple of hours. The claimant has been using oxygen since 2012." [R. 20]. As detailed within the ALJ's decision, Plaintiff's testimony and her

treatment record document Plaintiff's oxygen use at night. [Exhibit 5F at 2; Exhibit 6F at 4].

### 3. The ALJ Is Tasked With Formulating RFC

It is well established that determination of the RFC is an administrative task reserved for the ALJ. See Robinson v. Astrue, 365 Fed. Appx. 993, 999 (11th Cir. 2010) ("[T]he task of determining a claimant's [RFC] and ability to work is within the province of the ALJ . . . ."); accord 20 C.F.R. §§ 416.927(d)(2) and 20 C.F.R. 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity."). As such, the ALJ is not required to base his RFC finding on a doctor's medical opinion. [Doc. 13 at 8–10]. And see Green v. Social Security Admin., 223 Fed. Appx. 915, 924 (11th Cir. 2007) (holding that ultimate determination of RFC is for ALJ and that ALJ did not substitute his judgment for medical provider; finding substantial evidence supported RFC determination even though ALJ found treating physician's opinion inconsistent with objective medical evidence and even though record did not include any other medical opinion); see also SSR 96–5p ("Giving controlling weight to [treating source] opinions would . . . confer upon the treating source the authority to make the determination or decision about whether an individual

AO 72A
(Rev.8/82)

is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.").

It is Plaintiff's burden to provide medical evidence establishing her asserted functional limitations. See Doughty, 245 F.3d at 1278 (citation omitted). Here, the ALJ noted in his decision that Plaintiff's treating medical providers did not recommend or impose restrictions – not even Dr. Gorecki.[12] [R. 21]. As previously discussed, there is no evidence that Plaintiff's use of a cane was medically necessary before the date last insured (or afterwards for that matter) so omitting such limitation from the RFC does not amount to error. In addition, the treatment notes concerning Plaintiff's reliance on supplemental oxygen speak almost exclusively to use at night. And, as highlighted within the ALJ's decision, Plaintiff's alleged increased difficulty with breathing and purported dependence on a cane is all based upon Plaintiff's self-

---

[12] The ALJ properly assigned Dr. Gorecki's conclusory statement as to the ultimate question of disability little weight. [R. 22]. And see Robinson, 365 Fed. Appx. at 999.

28

reporting.[13]  [R. 19–21].  Accordingly, as discussed in greater detail below, the ALJ

properly discounted Plaintiff's self-reporting.

Finally, to the extent that Plaintiff, through counsel, faults the ALJ for not

ordering a consultative examination to flesh out the claimant's representations

concerning her asserted exertional limitations (i.e., standing and walking and / or

dependence on a cane or impact of potential need to supplement oxygen during the

workday), the propriety of doing so is a decision for the ALJ – not this Court.  [Doc.

12 at 11 n.4 (noting that no physical or mental consultative examinations were

obtained)].  The governing regulation reads in part:

> We will assess your [RFC] based on all of the relevant medical and other
> evidence.  **In general, you are responsible for providing the evidence
> we use to make a finding about your [RFC]**.  (See § 404.1512(c)).
> However, before we make a determination that you are not disabled, we

---

[13] In May 2014, the claimant *reported* problems breathing and using oxygen all
of the time.  She stated that she can lift a gallon of milk and only walk one to two steps
and that she has chest pain, shortness of breath, and has chest discomfort after
sweeping the kitchen for three to five minutes. [Exhibit 1F].  In August 2014, the
claimant *reported* changes in her condition with onset in July 2014.  The claimant
represented that it was harder for her to breathe, that she takes a rest after a couple of
steps of walking, that she cannot stand long, that she uses oxygen, and that she has
horrible back and leg pain rated at a severity level of eight out of ten daily.  [Exhibit
7E].  In June 2015, the claimant *reported* changes in her condition with onset in March
2015 (after her date last insured).  She cannot walk straight or stand up straight; she
cannot breathe after minimal exercise and is forced to rest after two to three steps; she
has constant back and leg pain; and she has a hard time cleaning.  [Exhibit 12E].

AO 72A
(Rev.8/82)

are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (e)).

20 C.F.R. § 404.1545(a)(3) (emphasis provided). "The [ALJ] has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision." Ingram v. Comm'r, Social Security Admin., 496 F.3d 1253, 1269 (11th Cir. 2007) (citing Doughty, 245 F.3d at 1281); accord Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003). The ALJ in this case deemed the existing record sufficient to allow him to make an informed decision about Plaintiff's RFC, and the ALJ's synthesis of the medical and opinion evidence was detailed and thorough.[14] As long as there is substantial evidence to support the RFC, it is not for the Court upon judicial review to direct the ALJ to gather more information or require additional evaluation or testing. See Lewis, 125 F.3d at 1440.

---

[14] For example, consistent with SSR 02-1p, when formulating Plaintiff's RFC, the ALJ discussed the various ways that obesity could cause limitation of function and found it reasonable to expect that Plaintiff's weight exacerbates her radicular and COPD symptoms. [R. 23].

AO 72A
(Rev.8/82)

**B.** **The ALJ's Evaluation Of Plaintiff's Subjective Complaints Comports With Proper Legal Standards And Is Supported by Substantial Evidence**

The Court also finds that the ALJ's evaluation of Plaintiff's subjective complaints of pain and limitations comports with proper legal standards and is supported by substantial evidence. When a claimant seeks to establish disability through subjective testimony concerning pain or other symptoms, a "pain standard" established by the Eleventh Circuit applies. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); see also Crow v. Comm'r, Social Security Admin., 571 Fed. Appx. 802, 807 (11th Cir. 2014) ("The 'pain standard' is applicable to other subjective symptoms as well.") (citing Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)). The claimant can satisfy this standard by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt, 921 F.2d at 1223).

Where a claimant's testimony, if credited, could support the claimant's disability, the ALJ must make and explain a finding concerning the credibility of the claimant's testimony. See Viehman v. Schweiker, 679 F.2d 223, 227–28 (11th Cir. 1982). "If the ALJ discredits subjective testimony, he must articulate explicit and

31

adequate reasons for doing so." Wilson, 284 F.3d at 1225 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The ALJ's evaluation of a claimant's subjective symptoms should be guided by the following relevant factors: (1) daily activities; (2) location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his symptoms; (5) treatment received and measures used, other than medication, for the relief of symptoms; and (6) any other factors concerning the functional limitations and restrictions due to the claimant's symptoms. See 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986)).

In this case, the ALJ found that while the "claimant's medically determinable impairments could reasonably be expected to cause some symptoms . . ., the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence . . . ." [R. 20]. The ALJ described Plaintiff's testimony regarding her impairments as "out of proportion with the objective medical findings." [R. 23]. In support of this finding, the ALJ pointed to the "very conservative and infrequent" treatment during the relevant

AO 72A
(Rev.8/82)

time period. [R. 20]. Specifically, the ALJ noted that, despite the benefit of insurance coverage, there was no medical evidence that the claimant engaged in physical therapy or underwent injections for her back pain. [R. 20]. The ALJ also pointed to Plaintiff's decision to continue smoking, the fact that Plaintiff's medication was managed and prescribed by her primary care physician, and the reporting of "normal mental status evaluations." [R. 20]. In evaluating Plaintiff's subjective allegations, the ALJ noted Plaintiff's testimony that she had been using a cane for three years and stated that "the first reports of cane use by the claimant was in October 2015, well after the date last insured."[15] [R. 21]. Finally, the ALJ acknowledged that Plaintiff engaged in opioid abuse in 2013 and lied to her primary care physician about scheduling a follow-up appointment with a specialist when seeking a medical refill which resulted in her being dismissed from the practice. [R. 22, 400–401].

In sum, the Commissioner persuasively argues that Plaintiff failed to meet her burden of proving that she had disabling symptoms and limitations. [Doc. 13 at 6].

_____

[15] The ALJ appears to refer to the first reports of cane use by the claimant *documented within treatment records* being in October 2015. Plaintiff and her spouse both claim that cane use began by 2012, well before the date last insured.

## V.    Conclusion

For all the foregoing reasons and cited authority, the Court concludes that the decision of the ALJ was supported by substantial evidence and was the result of an application of proper legal standards.    It is, therefore, **ORDERED** that the Commissioner's decision be **AFFIRMED**.    The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner.

**IT IS SO ORDERED THIS** 28th day of August, 2019.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)